# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00519-CR

---

**Jay Morgan, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 299TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-21-301135, THE HONORABLE KAREN SAGE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

A jury found appellant Jay Morgan guilty of indecency with a child by sexual contact and failed to reach a unanimous verdict on a charge of aggravated sexual assault of a child. *See* Tex. Penal Code §§ 21.11(a)(1), 22.021(a)(1)(B)(ii), (2)(B). The trial court declared a mistrial on the latter count and sentenced Morgan to fifteen years' confinement. *See id.* §§ 12.33(a), 21.11(d); *see also* Tex. Code Crim. Proc. art. 36.31 (allowing trial court in its discretion to discharge jury "where it has been kept together for such time as to render it altogether improbable that it can agree"). In three issues on appeal, he challenges the trial court's denial of his motion for new trial without a hearing and the sufficiency of the evidence supporting the jury's finding of guilt. The issues raised in the motion for new trial largely concerned a post-trial affidavit sworn by Renee Leal—who was Morgan's ex-fiancée and who did not testify at trial—in which she attested to having made incriminating statements to investigators, to having recanted those

statements before trial, and to having been told that "it was fine" and that she no longer needed to testify. We modify the judgment to correct a clerical error and affirm the trial court's judgment nunc pro tunc as modified.[1]

## BACKGROUND

The indictment alleged that in 2013 and 2014, respectively, Morgan caused his child, Emery Murray,[2] to touch Morgan's genitals and penetrated Emery's mouth with his sexual organ. At the time of the charged offenses, Emery was six or seven years old.

The State's trial witnesses included Emery; Emery's mother (Mother); Morris Johnson,[3] Emery's friend; Rosalee Guerra Callejas, a former forensic interviewer; and APD Detective Katy Conner. The State's evidence included screen-recordings and photographs of text messages exchanged between Emery and Morris, photographs of pages from Emery's journals, and an audiovisual recording of Morgan's police interview. Morgan presented testimony from Dr. Stephen Thorne, an expert on forensic psychology and forensic interviews, and Emery's brother (Brother) and paternal grandmother (Grandmother). Morgan's evidence included lists made by Emery of reasons to live with him and of pros and cons of living with each parent; Facebook photographs of Mother and her boyfriend, Michael Blum; documents pertaining to

---

[1] The trial court issued a judgment nunc pro tunc on August 9, 2024, to correct the offense date appearing on the original judgment form.

[2] At the time of the offense, Emery was identified by the pronouns she/her. However, at the time of trial, Emery went by the pronouns they/them or he/him. Because Emery was a child at the time at the time of the alleged offenses, we refer to Emery by a pseudonym in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

[3] Because Morris was also a child at the time of the alleged offenses, we refer to him by a pseudonym as well. *See id.*

2

Blum's convictions for child sexual offenses; Morgan's 2019 petition to modify his and Mother's divorce decree; and the divorce court's 2023 temporary orders enjoining Mother from allowing Blum to have contact with Emery.

Emery, who was sixteen years old at the time of trial in 2024, testified in detail about Morgan's abuse of Emery from the ages of five to eight. Emery, Morgan, Mother, and Brother—who is four years older than Emery—moved to Texas from Minnesota in 2011, when Emery was four. The following year, the family moved from an apartment into a one-story house that Emery referred to as the "asparagus house" in reference to a yucca tree in the front yard. Although Morgan and Mother had "separated," they continued to live together in the house for a time. Morgan slept in the primary bedroom, which had an attached bathroom, and Mother slept on a couch in the living room; Emery and Brother each had a bedroom. When Mother moved out of the house, Emery's paternal grandparents came to live with the family. Morgan and Mother had joint custody of Emery.

Despite the children having their own rooms at the "asparagus house," Emery "ended up sleeping in [Morgan]'s room pretty much" and "sharing . . . the same bed" as part of what Emery described as "a forced relationship dynamic." Morgan touched Emery's "private parts," which Emery felt was inappropriate because Emery was "a kid." Asked where specifically he touched, Emery replied, "The one that I remember most is I guess on my ass." Emery agreed that Morgan had touched "[o]n the outside" of the butt. Although Emery did not recall Morgan asking Emery to keep the abuse secret, Emery understood not to discuss it.

On one occasion, while Morgan and Emery—who was between five and seven at the time—were sitting on Morgan's bed at the "asparagus house," he asked Emery to choose between two "dildos." One of the dildos was "realistic" and "phallically shaped." Emery was

3

familiar with the appearance of a penis from having seen Morgan's.  Morgan placed the dildo that Emery selected on the bed between the two of them when Emery went to sleep that night.

In 2013 or 2014, when Emery was six or seven, the family, including Emery's grandparents, moved to a two-story house on Meuse Cove.  Emery and Morgan continued to sleep together at the new house but not as frequently.  They also showered together, which made Emery uncomfortable because they were both naked.

Emery related two incidents at the Meuse Cove house that involved Morgan's use of a "penis cage" when Emery was seven years old.  During the first incident, which occurred in Morgan's bathroom, he showed Emery the cage, explained how it functioned, and said that it was used to "lock [Morgan] up."  Emery described the cage as made of "some kind of gray, shiny metal" with "a thicker hoop at the back" and ending in an apparatus resembling "the top of a birdcage."  The penis cage also had an inch-long padlock and a silver key.

Later that day, after Emery and Morgan showered together, Emery sat at the foot of Morgan's bed wearing a blue dress; Morgan was either unclothed, or his clothes "weren't really being properly used for their purpose."  He put Emery's hand on his penis, which Emery referred to as his "dick," and Emery testified that it was hard and felt like skin.  Emery's eyes were open "for at least some of" the assault.  Eventually, he removed Emery's hand and said that Emery could leave.  Emery was relieved to have been wearing clothes and worried "what might have happened" had that not been the case.  During this and other instances of abuse, Brother was either in his room or at a friend's house; he was never present for the abuse.

In the second incident involving the penis cage, Morgan entered Emery's room at night and closed and locked the door.  Morgan was wearing a t-shirt and shorts and, when he undressed, revealed that he was wearing the cage beneath his clothes.  Emery testified, "I

4

remember something about the key and how it was, like, important, and I think I was supposed to be, like, in control of the key or something." Morgan took off the cage and put his penis in Emery's mouth. Emery felt "dread," was "scared and uncomfortable," and tried to avoid contact between his penis and Emery's tongue. Morgan slept in Emery's bed afterward.

The abuse ended when Emery was eight. In 2016 or 2017, when Emery was nine or ten, Morgan apologized for abusing Emery. While the two of them were driving to HEB, Morgan asked, "[D]o you remember how I treated you or what happened when you were a kid or, like, back then or something[?]" Emery replied affirmatively, and Morgan "kind of just apologized" and "said he was sorry and that it wasn't okay."

Emery did not tell anyone about the abuse in part because Emery was "kind of scared of what might happen . . . because of [Morgan's] previous anger issues." He was "a very avid yeller" and became angry more easily when he drank, which happened "pretty frequently." Emery first disclosed the abuse by text message to a friend, Morris, shortly after midnight on December 1, 2019, when Emery was twelve. At the time, Emery was living with Morgan and Brother in an apartment on Lakeline Mall Drive. In the first text to Morris, Emery wrote about having been molested by Morgan. In subsequent texts, Emery referenced Morgan's apology, which Emery suggested "could be fake," and referred to "a shit load of stuff he's done," including "drug stuff, probably physical abuse, emotional abuse, molestation and so on like that." Acknowledging that it was a mistake to request "50/50 [custody]," Emery admitted to not realizing "how bad it was [living with Morgan] week to week again." Asked about the possibility of reconciliation with Morgan if he "sincerely apologized actually," Emery answered, "[N]o, to be honest like he fucked me up." Emery added that "i don't know if he ever raped me, but honestly at this point i wouldn't be surprised"; that Emery "wouldn't be sad at all" if he were "gone"; and

5

that Emery did not "remember all the shit" because of "ptsd (probably)." Although Emery mentioned potentially telling Mother about the abuse, Emery could not tell Brother because "he's not good with serious stuff." When Morris asked how Morgan had molested Emery, Emery responded that there had been "physical contact" that was "just short of rape" and that it was "fucking WRONG." Emery did not elaborate and testified at trial that the texts were "very vague" because Emery was "extremely uncomfortable" and "had already crossed a boundary that night"; Emery did not feel "good enough to share more at the time."

Morgan and Mother were engaged in a "custody battle" over Emery from approximately 2019 through 2021. Emery and Mother "clashed regularly," and Emery expressed a desire to live with Morgan. Emery "got really spiteful towards [Mother]" and wrote a "List of reasons why I want to move out" as well as pro-and-con lists for living with each parent.[4] Among the reasons enumerated in the former were: "I am just genuinely unhappy there and am happy at your/my dad's house," "I am just scared to tell her most big things," and "[s]he doesn't like me talking to you/dad without her knowing and says the last time someone had a secret conversation with you/dad she had a child stolen from her ([Brother] when he was 12)."[5] Emery did not mention abuse in the cons for living with Morgan but characterized him as "toxic," "manipulative," and "angry." In the pros, Emery noted that he "buys me shit" and that Emery had a "lock on my door." As pros for living with Mother, Emery wrote "safe" and "comfortable."

---

[4] It is unclear from the record where Emery wrote the lists and how Morgan came to learn of them.

[5] Mother testified that she and Morgan "started out 50/50 custody for both children. When he was—when [Brother] was 12, he moved majority to [Morgan]."

6

However, after Morgan and Mother's custody agreement was modified in 2019 to give him greater custody of Emery—at Emery's request—Emery in the summer of 2020 no longer wanted to return to his house. The "memories and stuff just kind of started being, like, constant," and "all of it kind of started, like, hitting [Emery's] mental health." Eventually, "the comfort of [] not wanting to do anything and getting all the extra, like, perks of [Morgan's] house" were no longer worth it. By the time of trial, Emery was living with Mother and had not seen Morgan "in many years."

Around 2020, Emery was engaging in self-harm and created a series of journal entries. On the first page, the lines "Mary[6] saw you" and "why would you let me fall asleep" were written repeatedly as was "there's a lot more than you think" and "it was just a joke." The second page included a long missive addressed in part to Morgan:

> if my dad is reading this, then fuck you. like seriously. this is mostly your fault. i'm serious. you caused most of this shit. like what the fuck is wrong with you. you are seriously wrong in the head. you fucking pedophile. you fucking molested me for years. and i know you said you were sorry, but that is such a shitty apology. you ruined my entire fucking life. you do realize that doing that kind of thing to me ruined me for the rest of my life, and i know you never raped me, but you sure did get really fucking close a few times, didn't you. and i hate you. i genuinely hate you. you fucking piece of shit. there's still more, but all of that won't fit on this page even with my handwriting.
>
> sincerely, your fucked up kid.

The third page contained a drawing of a torso and the phrase, "come on, you know you like good little girls."

---

[6] "Mary" was seemingly a reference to Mary Fad, a woman whom Morgan dated during at least part of the period of the alleged abuse.

Emery outcried to Mother in March 2021, when Emery was thirteen years old. Emery "couldn't keep it in anymore" and "had to say something." Emery did not tell her everything; when Emery was about to go into greater detail, Mother "stopped [Emery] and did not want to hear" anything more.

After disclosing the abuse to Mother, Emery met with a Child Protective Services (CPS) investigator and forensic interviewer. Emery handed a note to the investigator that provided "the general gist" of what Emery "remembered at the time," "could jot down in a small paragraph," and were comfortable saying. The note read:

> When I was going to sleep at night, there were times when he came in and grabbed me. When I was like five he used to tell me to sleep in the same bed as him. He used to make me shower with him sometimes, too. He also often just ~~didn't~~ called me into his room to just like sit there with him, but nothing really happened then. He used to tell me to sit in his lap a lot, and just like made contact with me a ton. This mostly stopped when I was around eight though.

Emery agreed that before the meeting with the forensic interviewer, Mother told Emery "that it would be helpful for this custody situation if [Emery] gave a complete statement"; Emery did not remember Mother saying that the case would be dropped if Emery did not participate in the interview. When asked on cross-examination about telling the interviewer that Morgan had been wearing the penis cage when he put his penis in Emery's mouth, Emery answered, "I don't remember saying that, but that was apparently what I said." Emery had given an account of the abuse several times and did not remember every detail each time; Emery's memory was "extremely skewed," which is "the basis of human memory. The things that stick don't always really make sense."

Emery also testified on cross-examination about having met Mother's fiancé, Blum, once or twice and having been told before meeting him the first time that he was in prison because

8

"he got accused of having child pornography on his computer by his ex-wife and then got convicted of it." At Mother's encouragement, Emery had exchanged a couple of letters with him while he was in prison. He now lived in Dallas.

Mother testified about her relationships with Morgan, Emery, and Blum and about the events surrounding Emery's outcry. In 2019, when there was "definitely conflict" between Emery and Mother, Emery announced a desire to live with Morgan, and the divorce court modified the divorce decree to give Morgan primary custody of Emery. Five or six months later, Emery again decided to live with Mother, and Morgan required that Emery attend therapy with him as a condition for his agreement. A therapy session was scheduled, but Emery expressed to the therapist a wish not to participate.

During a February 2021 conversation between Emery and Mother about the therapy, Emery outcried to her about the abuse. While pacing back and forth, mumbling, and with shaking hands, Emery mentioned not wanting to see Morgan and—referring to his then-girlfriend—said that Emery knew "what Renee saw in the journals." Emery also said the word "pedophile" and had trouble speaking when Mother asked what that word meant to Emery. Emery denied that there "were [] hands somewhere [Emery] didn't want them to be." Mother began saying words like "hand," "touch," or "penis," and Emery would say "yes" or "no" in response. Asked about possible contact with Morgan's penis, Emery answered, "Not here," pointing to Emery's genitals, "but here," indicating the mouth.

Mother was in shock and immediately ended the conversation because she did not want to "misinterpret anything." The next morning, she asked if Emery was sure the abuse had not been a dream and called CPS. She did not believe Emery at the time and "figured it was up to CPS to determine what was real." She changed her mind after seeing "scars all over [Emery's]

9

arms" and recalling that Emery used to wet the bed. In addition to calling CPS, she took Emery for a forensic interview; she did not tell Emery what to say but explained that the case would be dropped if Emery did not participate because that is what she had heard from CPS. She may also have told Emery that participating in the interview would increase the probability of her getting custody.

Mother explained that prior to Emery's outcry, she had encouraged Emery to go to Morgan's and to have a relationship with him. Following the outcry, and on the advice of her attorney, she moved to terminate his parental rights so that "he didn't have any access to" Emery.

Mother met Blum, her fiancé, in 1993 when they were in high school; they reconnected in 2017, when he was in prison for child sexual offenses, and got engaged in 2021 or 2022. She believed that he had been "set up by a vindictive ex-wife" and, prior to his release from prison, had been working to have his convictions overturned.[7] She told Emery about his criminal history and hoped to live with both of them after Emery turned eighteen. Emery had met him but had never been alone with him. Mother agreed that she had not given Morgan the notice required by the divorce decree before introducing Emery to a sex offender. Emery and Blum had exchanged letters before Emery's outcry, but Mother "would always read them." Mother testified that she did not tell Emery to fabricate allegations to maintain her relationship with Blum.

Morris testified about his text exchange with Emery; the two had been friends since fifth grade, and his understanding was that Morgan molested Emery. Morris never disclosed the abuse to anyone. He did not know who Blum was.

---

[7] A federal jury found Blum guilty of sexual exploitation of children, receipt of child pornography, and possession of child pornography. *See* 18 U.S.C. §§ 2251, 2252(a)(2), (4)(B).

10

Callejas, the former forensic interviewer, testified about her March 2, 2021 interview of Emery, who was thirteen at the time. At the outset of her testimony, she defined the terms "delayed outcry" and "grooming." A delayed outcry "would be when a child makes a statement about abuse and it's not right away" but potentially "months later, even years later." Delayed outcries are common and may occur when the offender is a "family member, someone that [the victim] love[s], and they don't want anything to happen to them." Grooming refers to when an offender is "trying to gain trust from a child in order to harm them" and could include "giving gifts to the child."

At the start of the interview, Emery did not want to discuss the abuse, was nervous and uncomfortable, and did not "want to go through with" the interview. Emery initially had trouble speaking, accepted her offer of a notepad, and wrote "something along the lines of my dad is a pedophile." Emery explained that Mother had said Emery "had to do the cognitive interview, otherwise the case would be dropped," and that "it would help with the custody thing" if Emery did the interview. Callejas did not include Mother's statements in her report because she did not consider them to be relevant.

Emery told Callejas about "multiple incidences of dad laying down with [Emery] in bed" and about his making Emery shower with him between the ages of five and seven; "while in the shower, he would also make [Emery] wash his body." On one occasion, while Morgan was lying behind Emery, he "touched [Emery's] butt . . . over the clothing, and it was on top of [the] butt."

Emery also related the charged incidents in which Morgan put Emery's hand on his penis and put his penis in Emery's mouth; Emery referred to his penis as "his private part" or "the part that he used for peeing." The former incident happened when Emery was five or six years

11

old. Morgan was naked, and Emery was "fully clothed." Emery described his penis as feeling like "a stiff arm . . . with no hair." Emery was scared and uncomfortable during the assault, which stopped when he moved Emery's hand away and allowed Emery to leave.

When Emery was seven, Morgan made Emery put Emery's mouth on "the part where he pees." Emery was sitting at the edge of a bed, and he was standing and wearing "a cage on his private part" underneath shorts. Emery described keeping Emery's tongue back and told Callejas that they lied down together in the bed after the assault. Unlike in Emery's testimony, however, when speaking with Callejas, Emery denied seeing a key, said that "the cage was still on his private part" during the assault, and added "that dad had told [Emery] not to tell anyone."

Callejas was aware that Emery's statement differed in some respects from earlier accounts that Emery had given; Emery had not mentioned the cage when outcrying to Mother or when speaking with the CPS investigator. Callejas attempted to "resolve those discrepancies," and Emery denied having told Mother "all the details." Callejas testified that children sometimes have difficulty remembering details of assaults, "especially in situations of delayed outcries," whether because of time or the number of assaults or because trauma is blocking their recall.

Detective Conner testified about her investigation of Emery's allegations. As part of the investigation, she watched Emery's, Morris's, and Brother's forensic interviews; reviewed Emery's journals; applied for a search warrant for Morgan's apartment; interviewed him, Mother, and Grandmother; and spoke by phone with two of his ex-girlfriends, Leal and Fad, who Detective Conner testified "was in a relationship with [Morgan] during the time that [Emery] had mentioned a specific device that was used." Detective Conner further testified that the "information" that she had received was corroborated by Mother, Leal, Fad, Grandmother, and the journals' contents. Brother, on the other hand, "didn't corroborate anything regarding abuse of

12

[Emery] by Jay Morgan" and did not appear to know "anything about the incidents that had taken place." Nevertheless, he made statements that contradicted certain things said by Morgan in his interview.

Detective Conner was aware of the "custody battle" between Morgan and Mother but was not concerned that it influenced Emery's outcry. Similarly, Detective Conner raised Blum's criminal history with prosecutors and testified that it was "definitely something that we did take into consideration." Yet because Blum was in prison at the time of the alleged offenses and had not met Emery, "there was no indication or evidence leading [her] to believe that he was a potential suspect."

Detective Conner testified that there were a lot of "very weak denials," "deception," and "red flags" in her interview with Morgan, who was accompanied by his attorney. Morgan expressed interest in BDSM ("bondage, dominance, sadism, masochism"); mentioned owning and liking "devices and sex toys," including dildos and a penis cage; and "distanced himself drastically from bath time[,] . . . basically sa[ying] he had absolutely no memories of any kind of bath time, shower routines, any of that." He admitted to owning a penis cage during the "same time frame" as the abuse and claimed that Emery might have seen sex toys in his room if he left them out.

She found two of his responses odd. He had a difficult time remembering when he last saw Emery naked; made "kind of an additional comment that was unnecessary"; and failed to answer definitively, which can be an indication of deception: "Everything was I don't think so, I don't remember." Asked for the "biggest lie" Emery had told, he answered only that Emery would be dishonest about food.

Both parties introduced penis cages for demonstrative purposes. Detective Conner testified she had found the cage offered by the State, which "looked similar, if not exactly like the

13

one that was described by" Morgan and Emery. The cage offered by the defense, which differed "in terms of how it looks and size and so forth," was less consistent with Morgan's and Emery's descriptions but was "possible." She agreed that the defense's cage "would be very unlikely to fit into the mouth of a small child."

Dr. Thorne, Morgan's expert, testified regarding false allegations of child sexual abuse as well as his concerns about Callejas's forensic interview of Emery. Dr. Thorne discussed research suggesting that "a significant number of children who are interviewed by child advocacy centers [CAC] have not actually been sexually abused" and that "it's entirely possible that more people are incorrectly identified as having been abused than were actually being abused as a result of, you know, the interviews at [CACs]." Although he agreed that most studies have concluded the false-positive rate is in the single digits, he testified that no study has shown that a semistructured narrative interview—the approach used by every CAC in Texas—"is any better than just flipping a coin to decide if something actually happened to a child." He added that pressure from a parent can lead to a false allegation.

Dr. Thorne noted that Callejas had failed to ask questions to ensure she knew all of Emery's prior conversations about the alleged abuse. He testified that her determination that Mother's statements to Emery were irrelevant was not in line with "leading research and best practice guidelines." And he explained that her use of the term "trauma response" appeared to refer to memory repression, which "decades of research has told us" does not exist. He conceded on cross-examination that he would not expect a non-psychologist to have the same working definition of "repressed memory." He testified that he had heard the comparison of a penis with an arm—which Emery had made—"numerous times" and did not find it concerning or odd.

14

Grandmother and Brother testified about the sleeping arrangements at the "asparagus house" and Meuse Cove house. Grandmother moved into the "asparagus house" shortly after Mother moved out and shared a large twin bed with Emery. They slept together "[j]ust about" every night, and she was around her grandchildren "almost all the time." At the Meuse Cove house, Grandmother and her husband shared a room, but everyone slept upstairs and was "all right together." She never saw or heard anything that concerned her in any interaction between Emery and Morgan, and Emery never said anything "indicating . . . concerns about [Morgan's] behavior."

Brother testified that the Meuse Cove house's top floor, on which all of the bedrooms were located, was "a long hallway" and that he could hear "everything that was going on" when he was in his room: "[M]y door was always open and the walls were not that thick. I could hear people talking. I could hear footsteps. And I was frequently an insomniac, so I could hear people going up and down the stairs, going between rooms, anything like that." Emery never told him that Morgan was doing anything inappropriate, and Brother never saw or heard anything that he felt was not right.

After hearing the evidence and the attorney's arguments, the jury found Morgan guilty of indecency with a child by sexual contact and failed to reach a unanimous verdict on the aggravated-sexual-assault charge. The trial court declared a mistrial as to that count.

During a hearing following the guilt-innocence phase of trial but before the punishment hearing, the trial court stated:

15

I understand that there were mistakes made. *Brady* violations occurred in the original trial.[8] I understand that what I'm doing today, there's a risk factor, but I also know—I don't know what I'll decide when I learn more about those mistakes, but I know that they must be both favorable and material, and until I have more information, I don't—I don't know.

And so there may be a point where I will have to grant a new trial, and we may be back here where justice and law requires that, but right now—and I understand if we don't want to go forward with it today, but right now, my position is that we go forward with sentencing, and then the defendant can bring whatever motions that they have regarding a new trial, which I'll look at and decide at that time based on the facts and the evidence.

The punishment hearing was held on August 6, 2024, and the trial court sentenced Morgan to fifteen years' confinement.

On September 4, 2024, Morgan filed an amended motion for new trial in which he contended that "[a] new trial is warranted due to prosecutorial misconduct." Specifically, he asserted that prosecutors met with Leal on April 4, 2024, less than a week before the start of trial, and that Leal told them that she had lied to Detective Conner. In an affidavit attached to the motion, Leal averred that she had told Detective Conner that "while dating Jay Morgan [she] had seen a box containing a penis cage that belonged to him" and that he "liked to perform sex role play and that he liked to do 'Daddy's little girl.[']" Leal attested that her statements were untrue, that she had made them because she was angry at Morgan, and that she had disclosed their falsity to prosecutors, who told her that "it was fine" because she had not been under oath and "was now telling the truth." Leal also attested that she was later "informed that [she] was released from [her] subpoena to testify during Jay Morgan's trial." Leal was not called to testify at trial by either party.

---

 [8] The trial court's reference to "*Brady* violations" is unexplained by the record. At the time of the plea hearing, Morgan had not raised a *Brady* claim in any filing in the trial court. The "original trial" presumably refers to the guilt-innocence phase of the trial, which had just concluded.

Morgan raised two issues in his amended motion for new trial. In his first issue, he argued that "[t]he failure to disclose this materially exculpatory information is a violation of a prosecutor's duty under *Brady v. Maryland*, 373 U.S. 83 (1963), the Texas Code of Criminal Procedure art. 39.14, and the Texas Disciplinary Rules of Professional Conduct, rule 3.09(d)." In his second issue, he argued that the State "referenced [Leal's] statements through backdoor hearsay," which prevented defense counsel from "being afforded the opportunity to cross-examine Ms. Leal." Morgan further argued that prosecutors' failure to timely disclose Leal's recantation "created a false impression with the jury that Leal stood by the derogatory statements" and that "[t]he State failed to correct the perjury offered at trial" through Detective Conner's testimony that Leal corroborated investigatory information and "failed in their obligation of candor to the tribunal. *See* Tex. Disciplinary R. Prof'l Conduct 3.03."

On October 21, 2024, the trial court denied Morgan's amended motion for new trial without a hearing. In its order, the trial court explained the basis for its ruling:

> After careful consideration, the court finds that there is not a reasonable probability that, had the undisclosed evidence been disclosed to the defense, the result of the proceeding would have been different. The undisclosed evidence is, therefore, not material and, for this reason, the court finds that no hearing is required, and the motion should be denied.

This appeal followed.

### DISCUSSION

I. **Denial of Amended Motion for New Trial**

Morgan's first and second issues concern the trial court's denial of his amended motion for new trial without a hearing. In his first issue, he contends that the trial court abused its discretion by denying the motion "based on evidence when no hearing was held to present

17

evidence." In his second issue, he contends that the trial court abused its discretion by denying his request for a hearing on the motion because "the averments in the motion were both undeterminable from the record and reasonable."

The State responds that Morgan failed to present the amended motion for new trial to the trial court as required for entitlement to a hearing on the motion by Texas Rule of Appellate Procedure 21.6. In addition, the State argues that the trial court permissibly decided the motion on the basis of its contents and Leal's affidavit; that the motion and affidavit failed to state facts that, if true, would entitle Morgan to a new trial; and that he failed to address, much less prove, the materiality of Leal's recantation. Because Morgan's first and second issues are both grounded in the trial court's refusal to hold an evidentiary hearing on his motion, we consider them together.

## A. Whether Morgan's amended motion for new trial was timely presented

We first address the State's presentment argument. Rule 21.6 provides that a defendant must present a motion for new trial to the trial court within ten days of filing it, unless the trial court in its discretion permits it to be presented and heard within seventy-five days from the date when the court imposes or suspends sentence in open court. Tex. R. App. P. 21.6. A trial court does not abuse its discretion when it fails to hold a hearing if no request for a hearing was presented to it. *Gardner v. State*, 306 S.W.3d 274, 306 (Tex. Crim. App. 2009).

The Court of Criminal Appeals has held that in cases such as this, the trial court's written order denying a motion for new trial within the seventy-five-day period is sufficient to show that the motion was presented to the trial court. *See Musgrove v. State*, 960 S.W.2d 74, 76 (Tex. Crim. App. 1998); *Scaggs v. State*, 18 S.W.3d 277, 282 (Tex. App.—Austin 2000, pet. ref'd) ("Although the record does not otherwise show that the motion and affidavits were presented to

18

the trial court, the court's order denying the motion is sufficient to presume that the motion was presented to the trial court."). Morgan's sentence was imposed on August 6, 2024; thus, the seventy-five-day period in this case ended on Monday, October 21, 2024, which is the date on which the trial court considered his amended motion for new trial, as stated in the written order.[9] *See* Tex. R. App. P. 4.6, 21.6. We therefore conclude that the motion was timely presented and that the trial court would have abused its discretion by refusing a hearing on that basis. *See Green v. State*, 264 S.W.3d 63, 67 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ("[W]hen a trial court rules on a motion for new trial within the seventy-five day period, that ruling satisfies the requirement that the motion be 'presented within ten days of filing or the trial court permitted it to be presented after the ten days but within the 75 day period.'" (quoting *Musgrove*, 960 S.W.2d at 76 n.2)).

### B. Whether the trial court abused its discretion by deciding the motion without evidence.

Before addressing the reasonableness of the claims raised in Morgan's amended motion for new trial, we must address his first issue on appeal, namely, that the trial court abused its discretion by denying the motion "based on evidence when no hearing was held to present evidence." Morgan's argument is based on the language of the trial court's order, in which it found—addressing Morgan's *Brady* claim—that there was no "reasonable probability that, had the undisclosed evidence been disclosed to the defense, the result of the proceeding would have been different" and that the undisclosed evidence was therefore "not material." Morgan argues:

---

[9] Although the order was not file-stamped until the following day, October 22, 2024, it begins, "On this, the 21st day of October, 2024, came on to be considered the Defendant's Motion for New Trial in the above cause."

19

It appears the trial court denied the motion finding no new trial was warranted by determining evidence discovered since trial was not material. The trial court made no finding or recitation what evidence it concluded was not disclosed nor what evidence it determined was not material[10] . . . . [T]he trial court denied the motion without a hearing and without evidence. There is no evidence available to review whether the court abused its discretion in its denial of the motion. Indeed, there was no evidence available to the trial court on which it could base its decision. In short, the trial court . . . was unable to base a decision on evidence because there was no evidence before the court.

Morgan is correct that purported evidence attached to a motion for new trial is not self-proving and that any affidavits or exhibits attached to such a motion must be admitted at a hearing to constitute evidence. *See Stephenson v. State*, 494 S.W.2d 900, 909–10 (Tex. Crim. App. 1973) ("An affidavit attached to the motion is but a pleading that authorizes the introduction of supporting evidence. It is not evidence in itself; and in order to constitute evidence it needs to be introduced as such at the hearing on the motion."). However, he is wrong to conclude that a trial court must hold a hearing and receive evidence before ruling on the motion. The fact that an affidavit attached to a motion for new trial is not evidence does not mean that the trial court may not dispose of the motion after considering only the motion and affidavit. Indeed, the affidavit requirement is "a *prerequisite* to obtaining a hearing," *Klapesky v. State*, 256 S.W.3d 442, 454 (Tex. App.—Austin 2008, pet. ref'd) (emphasis added), and allows the trial court to conserve judicial resources and prevent fishing expeditions if a defendant fails to demonstrate the truth of the grounds of attack as well as reasonable grounds for believing error occurred, *see Colone v. State*, 573 S.W.3d 249, 260 (Tex. Crim. App. 2019); *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005). As noted above, "a trial court does not abuse its discretion in overruling a

---

[10] Presumably, the undisclosed evidence in question is that which forms the basis for Morgan's *Brady* claim: Leal's recantation of her statement to Detective Conner.

20

motion for new trial without a hearing unless the motion and supporting affidavits state facts that, if true, would entitle the defendant to a new trial." *Scaggs*, 18 S.W.3d at 281. In other words, a trial court does not abuse its discretion *per se* by deciding a motion for new trial without holding an evidentiary hearing on the motion. For that reason, we conclude that Morgan's first issue is without merit and overrule it.

C. **Whether the matters raised by the motion and affidavit were not determinable from the record and were reasonable**

Having concluded that the trial court's deciding the motion without the receipt of evidence at a hearing, without more, was not an abuse of discretion, we turn now to its denial of Morgan's hearing request.

"The right to a hearing on a motion for new trial is not absolute." *Rozell*, 176 S.W.3d at 230. A hearing on a motion for new trial is mandatory only when the trial court determines that the motion and accompanying affidavit(s) raise matters that are both not determinable from the record and reasonable, meaning they could potentially entitle the defendant to relief. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009); *Reyes v. State*, 849 S.W.2d 812, 816 (Tex. Crim. App. 1993) ("[W]hen an accused presents a motion for new trial raising matters not determinable from the record, upon which the accused could be entitled to relief, the trial judge abuses his discretion in failing to hold a hearing."). The trial judge's discretion and our review are limited to these two requirements, and the trial judge does not abuse her discretion by not holding a hearing if she determines that the defendant failed to show one or both of the requirements. *Smith*, 286 S.W.3d at 340 & n.23. To be sufficient to entitle the defendant to a hearing, the motion and affidavit(s) need not establish a prima facie case for a new trial or reflect every component legally required to establish relief but must "reflect that reasonable

21

grounds exist for holding that such relief could be granted." *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003) (quoting *Martinez v. State*, 74 S.W.3d 19, 22 (Tex. Crim. App. 2002)); *see Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994).

We review a trial court's denial of a hearing for an abuse of discretion. *Wallace*, 106 S.W.3d at 108; *Corporon v. State*, 586 S.W.3d 550, 557 (Tex. App.—Austin 2019, no pet.). "In so doing, we reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Smith*, 286 S.W.3d at 339. The question is not whether the trial court has reasonably denied the motion for a new trial but rather whether the court has reasonably denied the defendant a hearing on his motion for a new trial. *See Wallace*, 106 S.W.3d at 108. In reviewing the trial court's denial of a hearing, we may affirm the trial court's decision if it was correct based upon any applicable theory of law, even if the basis has not been advanced by the appellee. *Martinez*, 74 S.W.3d at 21.

From our review of Morgan's amended motion for new trial, we understand him to have raised the following issues: (1) the State's failure to disclose Leal's recantation violated his due-process rights under *Brady* and (2) article 39.14 of the Code of Criminal Procedure, (3) the conduct of the State's attorneys violated Disciplinary Rules 3.03 and 3.09, (4) Morgan was denied the right to effectively cross-examine Leal,[11] and (5) Detective Conner's testimony concerning her interview with Leal gave the jury a false impression.

---

[11] Morgan asserts in his brief that his amended motion for new trial alleged he was "prevented from effectively cross-examining the witnesses." The issue as presented in the motion, however, was limited to his ability to cross-examine Leal specifically. To the extent he now claims that he was denied effective cross-examination of other witnesses, his issue is unpreserved. *See* Tex. R. App. P. 33.1(a); *Keeter v. State*, 175 S.W.3d 756, 759 (Tex. Crim. App. 2005) (stating that complaint must be raised in motion for new trial proceedings to be preserved for appellate review); *Tamminen v. State*, 653 S.W.2d 799, 807 (Tex. Crim. App. 1983) (Onion, P.J., concurring and

22

### i. *Brady*

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Since *Brady*, the Supreme Court has held that the duty to disclose such evidence is applicable even though there has been no request by the accused. *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The Supreme Court has also held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

"Favorable" evidence is any evidence that, if disclosed and used effectively, "may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Favorable evidence includes exculpatory evidence as well as impeachment evidence. *Pena v. State*, 353 S.W.3d 797, 811 (Tex. Crim. App. 2011). "Exculpatory evidence may justify, excuse, or clear the defendant from fault, while impeachment evidence is that which disputes or contradicts other evidence." *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006).

"The nondisclosure of favorable evidence violates due process only if it is 'material' to guilt or punishment." *Diamond v. State*, 613 S.W.3d 536, 546 (Tex. Crim. App. 2020). "Evidence is material only if there is a reasonable probability that, had it been disclosed, the outcome of the trial would have been different." *Id.* "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "The mere possibility that an item of undisclosed information might have helped the defense, or might

---

dissenting) ("[T]he complaint in the motion for new trial does not comport with the complaint on appeal. Thus no review is preserved.").

23

have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109 (1976). "Materiality is determined by examining the alleged error in the context of the entire record and overall strength of the state's case." *Diamond*, 613 S.W.3d at 546. In evaluating materiality, it is important to consider how disclosure could have affected defense preparation, with an awareness of the difficulty of post-trial reconstruction. *Bagley,* 473 U.S. at 683.

The State correctly notes that Morgan did not attempt to explain, in either his amended motion for new trial or brief, how Leal's averment that she lied to Detective Conner about seeing Morgan in possession of a penis cage and about his engaging in "Daddy's little girl" roleplay was material. As Morgan acknowledged in his motion, Leal did not testify at trial, and no evidence was admitted of her recanted statements or their contents. She was mentioned only twice during the trial. Mother testified that during Emery's outcry, Emery stated, "I think I know what Renee saw in the journals." And Detective Conner briefly testified about an interview with Leal:

Q. And then so the next step in the investigation would be what?

A. So after that, I talked to Renee Leal.

Q. Who is Renee?

A. That was Jay's fiancé[e] at the time. They had just broken up and—yeah, they had just broken up at that point.

Q. And how long did that interview last?

A. I believe that was about an hour.

Q. Okay. Generally speaking, did she corroborate the information you had already received?

A. Yes.

24

Detective Conner elsewhere testified that the information she had received was also corroborated by Mother, Grandmother, the contents of Emery's journals, and Fad—Morgan's ex-girlfriend whose relationship with him, according to his statement to investigators, had involved the use of a penis cage. There was no evidence at trial that Morgan engaged in any kind of roleplay, and the evidence tying him to the penis cage was derived not from Leal but from Emery's testimony and Morgan's own recorded interview statement. During the interview, he admitted to owning, around 2013 to 2015—the time period in which the charged offenses were alleged to have occurred—an item that "a guy wears that like, you know, keeps your cock encaged." He explained that the item, which he referred to as a "cage" or "kind of like a chastity-belt-type situation," was "part of . . . [his] relationship" with Fad. He described the penis cage in great detail closely agreeing with the description provided by Emery.

Against this record, evidence that another of Morgan's ex-partners had claimed to see the cage and had then recanted her statement as a fabrication made in anger could have worked against him. It is not hard to imagine a reasonable juror wondering at the likelihood that Leal would invent an item that Morgan had admitted to owning and that Emery had alleged was used in the abuse. The same juror might similarly have wondered why Leal chose "Daddy's little girl" roleplay as the subject of her other fabrication.

Moreover, there was evidence in the record from which the trial court could have concluded that the jury might doubt the credibility of Leal's recantation. In Morgan's interview, which occurred a month after Leal gave her statement to Detective Conner, he referred to Leal as having been his fiancée and stated that she believed he cheated on her, that who initiated their breakup was a "matter of contention," and that their reconciliation was going "pretty well." Although Morgan told Detective Conner that Leal had read Emery's journals, he believed that Leal

25

had read only that Emery identified as male and that Emery thought Morgan would hate Emery for it.

For these reasons, we conclude that the trial court did not abuse its discretion by finding that Leal's recantation was not material and that Morgan consequently failed to demonstrate reasonable entitlement to relief or by refusing to hold a hearing on his amended motion for new trial on the basis of this issue. *Smith*, 286 S.W.3d at 339–40 & n.23.

### ii.    Article 39.14

Morgan's article 39.14 claim was based on a purported prosecutorial violation of a duty to disclose information. Article 39.14, enacted as part of the Michael Morton Act, requires the State to "disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." Tex. Code Crim. Proc. art. 39.14(h). The State's duty of disclosure under this provision "is much broader than the prosecutor's duty to disclose as a matter of due process under *Brady v. Maryland*." *Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021). It creates "an independent and continuing duty for prosecutors to disclose evidence that may be favorable to the defense even if that evidence is not 'material,'" and it "requires disclosure of evidence that merely 'tends' to negate guilt or mitigate punishment." *Id.* The duty is free-standing and "exists regardless of whether the defense ever requests discovery from the State." *State v. Heath*, 696 S.W.3d 677, 695 (Tex. Crim. App. 2024).

Violations of article 39.14 are still subject to a harm analysis, *see Watkins*, 619 S.W.3d at 291, and because the State's duties under the Michael Morton Act are statutory in

nature, any violation of the Act "must be disregarded" unless it affects a defendant's "substantial rights," Tex. R. App. P. 44.2(b). Under Rule 44.2(b), an error "affects substantial rights only if it has a substantial and injurious effect or influence in determining the jury's verdict." *Stredic v. State*, 663 S.W.3d 646, 655 (Tex. Crim. App. 2022). "Put another way, an error does not affect substantial rights if an appellate court has fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect." *Id.* at 655–56. In determining whether a defendant's substantial rights were affected, we "consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). We may also consider "the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable," as well as "whether the State emphasized the error." *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002).

The State does not deny or offer a legal justification for its failure to disclose Leal's recantation to the defense before trial. The State did not file a response to Morgan's motion for new trial and in its brief on appeal admits that it "did not affirmatively dispute that the prosecutor failed to timely disclose Leal's recantation of her prior statements regarding the penis cage and the sexual role playing." The trial court, in its order denying the motion for new trial, found that evidence was "undisclosed." On the record in this case and in the light of the breadth of article 39.14's scope, we conclude that the State's untimely disclosure of the recantation violated its duty under the statute. *See* Tex. Code Crim. Proc. art. 39.14(h); *Watkins*, 619 S.W.3d at 277; *see also Ex parte Vasquez*, 499 S.W.3d 602, 626 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (Jennings, J., dissenting) ("What is painfully obvious, however, is that there is simply *no*

27

*evidence* to which the State can point demonstrating that it actually fulfilled its affirmative duty and provided the recantation evidence to the defense.").

While the State did not brief the question of error, it argues that its failure to disclose Leal's recantation was harmless. We agree. As discussed above, she did not testify at trial, no part of her recanted statement was offered by the State, and Detective Conner did not testify to any specific statement made by Leal. The detective's testimony that Leal corroborated "the information [she] had already received" was vague and was not the "backdoor hearsay" that Morgan characterizes it as. Detective Conner's testimony cannot be said to "lead to any inescapable conclusions as to the substance of the out-of-court statements." *Head v. State*, 4 S.W.3d 258, 262 (Tex. Crim. App. 1999). She testified that multiple individuals, and Emery's journals, had also corroborated information she learned through her investigation.

Moreover, the penis cage—which Morgan explicitly admitted to having owned during the period of alleged abuse—was associated in the evidence not with Leal but with Fad. Referring to Fad, he told Detective Conner that the cage "was kind of part of a specific relationship[,] . . . the first serious, if you call it that, BDSM relationship that I had." For that reason, Detective Conner testified that Fad was "a person that was very specific to the time frame of when the abuse allegations were coming up," that she was someone who "was in a relationship with [Morgan] during the time that [Emery] had mentioned a specific device that was used," that Morgan "mentioned that she was specific to that relationship and that device," and that she "corroborated a few things." Conversely, there was nothing in the record to suggest that the fact that Leal—who began dating Morgan years after the alleged abuse—had not seen the penis cage would have been particularly exculpatory. To the contrary, evidence of her recantation would have begged the question as to why she decided to fabricate statements involving a penis cage and

28

minor roleplay, specifically. And there is a reasonable probability that the jury might have doubted the credibility of Leal's recantation given that she was Morgan's ex-fiancée and that he told Detective Conner their reconciliation was going "pretty well." Even had the defense been aware of Leal's recantation, there were compelling reasons for defense counsel not to call her as a witness and thereby open her up to a potentially undesirable cross-examination.

The defense's trial theory and the strength of the State's case likewise support the conclusion that any violation of article 39.14(h) was harmless. As framed by defense counsel during his closing argument, the defense's theory was that "Morgan is being set up by [Mother]," who "wants [Morgan] out of the way so she can continue her clandestine relationship with Michael Blum, a registered sex offender," because "Morgan is the only person in the world who can stop her from doing that." Yet Emery disclosed the abuse to Morris two years before outcrying to Mother and testified that Mother had not seen Emery's journals, which were made a year before the outcry and which referred to sexual abuse by Morgan. Mother herself testified that she had not believed Emery at first. And there was no evidence as to how Mother could have instructed Emery to allege the use of a penis cage, as Morgan had purchased the instrument at least a year after his and Mother's divorce as part of a subsequent relationship. Rather, the defense's theory would have required that Morgan had left the penis cage out in plain view; that Emery had either gone into his room in his absence or, having passed the room when the door was open, happened to notice the penis cage; that Emery had recognized it for what it was despite being a young child; and that Emery had told Mother but not Brother or Grandmother about it.

Furthermore, Mother and Blum's relationship was hardly clandestine. Both Mother and Emery testified that Emery was aware of Blum's criminal history. Mother had posted Facebook photographs of her and Blum in 2018, when he was still in prison, and had tagged his

29

name to the post. She testified that she had worked to overturn his convictions so that they could "live together as a normal couple," that she and Emery had attended a party at his mother's house while he was on house arrest, and that she and Blum regularly traveled to each other's residences since his release on parole. The couple were engaged and still intended to marry as of the time of trial.

The State's case was aided by Morgan's own interview statements. He told Detective Conner that Grandmother, whose testimony he elicited to show that he lacked the opportunity to abuse Emery, had quit living with him because she and his father were drinking heavily, hiding drinks in the kitchen, and forgetting where they had hidden them. He could no longer trust his parents because of their drinking.

As Detective Conner noted, he attempted wholly to distance himself from his children's bathing. Despite having divorced Mother when Emery was five, he stated that he did not know when Emery began bathing, that he had "no specific memories" of helping his children bathe or shower, and that bathing was "not a part of his experience of their childhood or [of] parenting." Yet when asked the last time he had seen Emery naked, he guessed "many years ago" when Emery would have been bathing around ages five or six.

He admitted to owning the sex toys that Emery alleged were used during the abuse; in addition to describing the penis cage in very similar terms as did Emery, he told Detective Conner, "I have had dildos and vibrators, different shapes and sizes." He agreed that Emery must have seen the toys "because of what we're talking about" but suggested that he must have left them out with his door closed. Asked which toys Emery had likely seen, he answered, "I would think like thinking through it kind of logically that it was probably either dildos or the cage thing," offering both toys that Emery had mentioned in the allegations.

30

When Detective Conner asked Morgan if Emery had a reputation for making things up, he stated:

> That's a good question. That goes to my premise, doesn't it? I don't think I know—wow—how would I—I don't think it's so much that [Emery] has a reputation for making things up, like, but let me think—like has [Emery] ever like tried to—I don't know that [Emery] would so much make something up as [Emery] would—like it would be a sin of omission instead of a sin of commission. So, I don't know that [Emery] would necessarily make something up; I think [Emery] might tell you something but not tell you the whole story.

He posited that Emery's biggest lie was "[l]ike about eating, for instance. [Emery] would like not tell you the whole story of what [Emery] ate."

Perhaps most significantly, his denials were heavily circumscribed. He did not think that either of his children had walked in on him having sex but was not certain. Similarly, Emery had never walked in on him while he was masturbating to his knowledge, but he did not know. Asked if Emery had ever touched his penis, he replied, "Oh, God, I don't think so ever. No. I don't think that's ever, ever happened. I don't think I would let that happen. I don't think that's ever happened." Pressed whether it could have happened accidentally or out of curiosity, he paused for a long moment and asked, "I mean, like, my naked penis?" He continued to hedge his denials by saying that he "didn't think" that Emery had seen or touched his penis.

Asked if Emery had lied about his putting his penis in Emery's mouth, he responded, "Oh, God, yes. I don't think that's ever happened in our lifetime, ever. I don't think that's something that I would do, ever. I don't—I don't know where that comes from, but no, I don't think that's ever happened." And asked if the penis cage could have contacted Emery, he answered, "I hope to God not. I don't think so. I don't think that there would be a time that it would, ever, that [Emery] would come in contact with my penis, wearing the cage thing or not."

31

Having considered the full record in this case, we conclude that the trial court would not have abused its discretion by determining that the State's violation of article 39.14(h) was harmless and that Morgan therefore did not raise a reasonable ground for relief. *See* Tex. R. App. P. 44.2(b); *Stredic*, 663 S.W.3d at 655. The trial court would not have abused its discretion by denying him a hearing on the basis of this claim. *Smith*, 286 S.W.3d at 339–40.

### iii.    Disciplinary Violations

Morgan contends that the State's failure to disclose Leal's recantation violated Disciplinary Rules 3.03 and 3.09. In relevant part, Rule 3.03 provides:

> If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall make a good faith effort to persuade the client to authorize the lawyer to correct or withdraw the false evidence. If such efforts are unsuccessful, the lawyer shall take reasonable remedial measures, including disclosure of the true facts.

Tex. Disciplinary R. Prof'l Conduct 3.03(b). And Rule 3.09 requires that

> [t]he prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

*Id.* R. 3.09(d).

"The Court of Criminal Appeals has held that in cases where a disciplinary rule violation is alleged, 'it is unnecessary for trial and appellate courts to decide whether the State's conduct violated a disciplinary rule. That is the domain of the State Bar.'" *Corporon*, 586 S.W.3d at 564. "[O]ur role is to determine the effect of the alleged rule violation on the fairness of the

32

trial proceedings." *Id.* "An alleged disciplinary rule violation by the State does not require a reversal of a conviction unless the defendant can demonstrate 'actual prejudice,' i.e., that 'the alleged disciplinary rule violation affected his substantial rights or deprived him of a fair trial.'" *Id.* at 564–65 (quoting *House v. State*, 947 S.W.2d 251, 252 (Tex. Crim. App. 1997)); *see Williams v. State*, 707 S.W.3d 233, 241 (Tex. Crim. App. 2024).

From the record in this case, the trial court would not have abused its discretion by concluding that Morgan's allegations of disciplinary violations were not reasonable grounds for relief. *Smith*, 286 S.W.3d at 339–40. The State is correct that he did not assert, much less show, that he suffered prejudice from the State's failure to disclose the recantation. For the same reasons discussed in our Rule 44.2(b) analysis above, the trial court would not have abused its discretion by denying a new-trial hearing on the basis of this issue. *See Brown v. State*, 921 S.W.2d 227, 230 (Tex. Crim. App. 1997).

### iv. Effective Cross-Examination

Morgan contended in his amended motion for new trial that the trial court abused its discretion by denying his right to cross-examine Leal. Because Leal did not testify at trial, we understand him to mean that he was denied the opportunity to effectively cross-examine Detective Conner—through whose testimony he asserts that Leal's out-of-court statements were admitted—about those statements. "The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska*, 415 U.S. 308, 315–17 (1974) (quoting U.S. Const. amend. VI). "This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400, 403 (1965)." *Id.* Notably, the Confrontation Clause guarantees only the *opportunity* for effective

33

cross-examination, "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

Cases arising under the Confrontation Clause "fall into two broad, albeit not exclusive, categories: 'cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination.'" *Kentucky v. Stincer*, 482 U.S. 730, 737 (1987) (quoting *Fensterer*, 474 U.S. at 18); *see Thomas v. State*, 837 S.W.2d 106, 110 (Tex. Crim. App. 1992). These categories reflect the clause's application exclusively to "'witnesses' against the accused—in other words, those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)).

This case falls in neither category. *See Fensterer*, 474 U.S. at 19. As noted above, Detective Conner's testimony that Leal generally "corroborated the information [she] had received" was sufficiently nebulous so as to in no way convey the substance of Leal's statements, and there was nothing to suggest that the State's sole intent in eliciting the testimony was to convey that substance. Accordingly, "the restrictions the Confrontation Clause places on 'the range of admissible hearsay,' are not called into play" because "the State made no attempt to introduce an out-of-court statement" by Leal, such as by hearsay. *See id.* The second category is also inapplicable because Leal did not testify, and the trial court "did not limit the scope or nature of defense counsel's cross-examination in any way" with respect to counsel's ability to cross-examine Detective Conner about any statement made by Leal. *See id.* Because Morgan's right to cross-examination was not implicated, the trial court would not have abused its discretion by refusing to grant him a hearing on his amended motion for new trial on that basis. *See Smith*, 286 S.W.3d at 339; *Wallace*, 106 S.W.3d at 108.

34

### v. False impression

In his amended motion for new trial, Morgan argued that "[t]he failure of the prosecutor's obligation to timely inform the Court and defense counsel created a false impression with the jury that Leal stood by the derogatory statements made to law enforcement about Defendant." The false impression, Morgan asserts, arose from Detective Conner's testimony that Leal, with whom the detective spoke for around an hour, "corroborate[d] the information [she] had already received." We understand Morgan's argument as a claim that his conviction was secured through the use of false testimony.

"The use of material false testimony to procure a conviction violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution." *Ex parte Reed*, 670 S.W.3d 689, 767 (Tex. Crim. App. 2023). "In any claim alleging the use of false testimony, a reviewing court must determine: (1) whether the testimony was, in fact, false; and (2) whether the testimony was material." *Id.*; *accord Ukwuachu v. State*, 613 S.W.3d 149, 156 (Tex. Crim. App. 2020).

Falsity does not require that the testimony in question be perjured; instead, the question is whether, considered in its entirety, the testimony "left the jury with a false or misleading impression." *Reed*, 670 S.W.3d at 767; *see Ex Parte Robbins*, 360 S.W.3d 446, 462 (Tex. Crim. App. 2011) ("It is true that we have held that testimony may be false because it creates a false impression of the facts."). Generally, when testimony was false because it created a false impression, "the witness omitted or glossed over pertinent facts." *Robbins*, 360 S.W.3d at 462; *see Alcorta v. Texas*, 355 U.S. 28, 30–32 (1957) (holding that murder witness's testimony that he and victim had "casual friendship" was false because it created a false impression of facts, since witness was actually victim's "lover and paramour"); *Ex parte Ghahremani*, 332 S.W.3d 470, 478

(Tex. Crim. App. 2011) (concluding that victim's mother created misleading impression of facts because she testified about changes in victim's situation but omitted key facts, did not address significant period of time, and attributed all of victim's psychological treatment to defendant's actions); *Burkhalter v. State*, 493 S.W.2d 214, 218 (Tex. Crim. App. 1973) (holding that, although witness's statement was not technically false, it "conveyed an impression to the jury which the State knew to be false" when witness's lawyer had understanding with State that witness would not be prosecuted if he testified, but witness testified he did not have agreement with State). "To establish falsity, the record must contain some credible evidence that clearly undermines the evidence adduced at trial, thereby demonstrating that the challenged testimony was, in fact, false." *Reed*, 670 S.W.3d at 767. "While various types of evidence may serve to demonstrate falsity, the evidence of falsity must be 'definitive or highly persuasive.'" *Id.* (quoting *Ukwuachu*, 613 S.W.3d at 157). It is irrelevant whether the testimony's proponent acted in good or bad faith. *See Ex parte Chaney*, 563 S.W.3d 239, 263 (Tex. Crim. App. 2018).

The standard for materiality is whether there was a reasonable likelihood that the false testimony could have affected the jury's judgment.[12] *Reed*, 670 S.W.3d at 767. In other words, we must ask whether the testimony "tipped the scales in favor of persuading the jury . . . to convict" the defendant. *Ex parte De La Cruz*, 466 S.W.3d 855, 871 (Tex. Crim. App. 2015); *see Ex Parte Weinstein*, 421 S.W.3d 656, 669 (Tex. Crim. App. 2014) (concluding that habeas applicant failed to show false testimony was material because it was "very unlikely that [the witness's] testimony was the tipping point" in light of "all of the circumstantial evidence"). The

---

[12] The "reasonable likelihood" standard is "more stringent (*i.e.,* more likely to result in a finding of error)" than the "reasonable probability" standard under *Brady*. *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011).

standard is the same as that for harm under Rule 44.2(a), "'which requires the beneficiary of constitutional error to prove beyond a reasonable doubt that the error did not contribute to the conviction.'" *Reed*, 670 S.W.3d at 767 (quoting *Ghahremani*, 332 S.W.3d at 478); *see* Tex. R. App. P. 44.2(a).

Even assuming that Detective Conner's testimony was false, insomuch as it could have created a false impression, Morgan has not satisfied the materiality requirement of a false-testimony claim. We have addressed the evidence in this case and do so again below when addressing Morgan's sufficiency claim. As we recounted, Morgan himself admitted to owning the penis cage during the alleged period of abuse, and Detective Conner testified that information she received was also corroborated by Grandmother, Mother, and Fad and by Emery's journals. It is also worth noting that Morgan and Leal began dating after the alleged abuse, that she had little relationship with Emery, and that she did not testify at trial. The trial court could have concluded from this record that there was not a reasonable likelihood Detective Conner's testimony that Leal corroborated certain information tipped the scales or affected the jury's verdict. *See Reed*, 670 S.W.3d at 767; *De La Cruz*, 466 S.W.3d at 871; *Weinstein*, 421 S.W.3d at 669; *cf. Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection."). Because Morgan failed to establish that the testimony was material, the trial court would not have abused its discretion by refusing to hold a hearing on the basis of his false-evidence claim. *See Smith*, 286 S.W.3d at 339–40; *Wallace*, 106 S.W.3d at 108.

In light of the foregoing analysis, we overrule Morgan's second issue.

## II.     Sufficiency of the Evidence

In his third issue, Morgan contends that the evidence was insufficient to support his conviction for indecency with a child by sexual contact.  In support of his contention, he largely re-urges his trial theory, arguing that the evidence showed that Emery was happy living with him until Mother induced Emery to make false allegations against him.  Additionally, he argues that the jury's finding of guilt was inconsistent with its failure, on the same evidence, to reach a verdict on the charge of aggravated sexual assault of a child.  The State responds that by stressing only the evidence supporting his defensive theory, Morgan applies the wrong standard of review and that his inconsistent-verdicts argument is improper.

Due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018).  When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013).  We measure the sufficiency of the evidence against the hypothetically correct jury charge.  *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023).

In conducting our review, we evaluate all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).  "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient

38

to establish guilt." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). We presume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Our concern is whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "'is restricted to guarding against the rare occurrence when a fact finder does not act rationally'" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))).

The trier of fact is the sole judge of the weight and credibility of the evidence. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *see* Tex. Code Crim. Proc. art. 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo*, 559 S.W.3d at 487. When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *see Musacchio v. United States*, 577 U.S. 237, 243 (2016) (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). We must "'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). The factfinder may rely on common sense and

apply observation and experience gained in ordinary affairs when drawing inferences from the evidence. *Acosta*, 429 S.W.3d at 625.

As charged in this case, a person commits indecency with a child if he causes a child younger than seventeen years of age to engage in sexual contact by touching any part of the child's body, including through clothing, with any part of his genitals and with the intent to arouse or gratify the sexual desire of any person. *See* Tex. Penal Code § 21.11(a)(1), (c)(2). "[I]t is well established that 'the requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all surrounding circumstances.'" *Corporon*, 586 S.W.3d at 562 (quoting *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981)); *see Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) ("Mental states are almost always inferred from acts and words."). "Intent can be inferred from conduct alone, and no oral expression of intent or visible evidence of sexual arousal is necessary." *Tienda v. State*, 479 S.W.3d 863, 873 (Tex. App.—Eastland 2015, no pet.).

The uncorroborated testimony of the child-victim alone is sufficient to support a conviction for indecency with a child by sexual contact. Tex. Code Crim. Proc. art. 38.07(a), (b)(1); *Turner v. State*, 573 S.W.3d 455, 459 (Tex. App.—Amarillo 2019, no pet.). Medical or physical evidence is not required. *Turner*, 573 S.W.3d at 459. Moreover, courts "liberally construe the testimony of child sexual abuse victims," *Cantu v. State*, 678 S.W.3d 331, 358 (Tex. App.—San Antonio 2023, no pet.), and outcry testimony retains probative value even if contradicted, especially if other witnesses corroborate it, *see Bargas v. State*, 252 S.W.3d 876, 888 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (citing *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)).

The indictment alleged in relevant part that Morgan caused Emery to touch his genitals with the intent to arouse and gratify his sexual desire. *See* Tex. Penal Code § 21.11(a)(1), (c)(2). The evidence in this case has been laid out above exhaustively. Emery testified that at the Meuse Cove house, Morgan put Emery's hand on his penis. Portions of Emery's testimony were corroborated by Mother, Morris, Grandmother, and Morgan as well as by Emery's journals and the text messages Emery exchanged with Morris in 2019, two years before Emery's outcry. Moreover, as discussed in Detective Conner's testimony, Morgan in his interview made inculpatory statements suggestive of his guilt.

We conclude that when viewed under the appropriate standard of review, this evidence was sufficient for a reasonable juror to find that the State proved all elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 313; *Lang*, 561 S.W.3d at 179; *see also* Tex. Code Crim. Proc. art. 38.07(a), (b)(1). Our conclusion is unchanged by the jury's failure to reach a verdict on the aggravated-sexual-assault count because "[w]hen measuring the sufficiency of the evidence, each count must stand or fall on its own," and an appellant cannot rely on inconsistent verdicts to attack a conviction. *Hernandez v. State*, 556 S.W.3d 308, 331 (Tex. Crim. App. 2017); *see McCall v. State*, 635 S.W.3d 261, 273–74 (Tex. App.—Austin 2021, pet. ref'd) (noting that reviewing court does not "speculate about why a jury returned the verdicts that it did" and that "[w]hen a multi-count verdict appears inconsistent, our inquiry is limited to determining whether the evidence is legally sufficient to support the count on which a conviction is returned").

## III. Modification of the Judgment

In a motion for judgment nunc pro tunc filed subsequent to this appeal, the State notes that the judgment form erroneously indicates that punishment was assessed by the jury and asks that we modify the judgment to reflect that the trial court assessed punishment in this case. Appellate courts have the authority to correct or reform a judgment when the necessary information is available to do so. *See* Tex. R. App. P. 43.2(b) (authorizing court of appeals to modify trial court's judgment and affirm as modified); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Accordingly, we modify the judgment nunc pro tunc in trial court cause number D-1-DC-21-301135 to reflect that the trial court, not the jury, assessed punishment. We dismiss the State's motion for judgment nunc pro tunc as moot.

### CONCLUSION

Having overruled Morgan's issues on appeal and having modified the judgment nunc pro tunc in trial court cause number D-1-DC-21-301135 as set out above, we affirm the judgment nunc pro tunc as modified.

_____

Rosa Lopez Theofanis, Justice

Before Justices Triana, Kelly, and Theofanis

Modified and, as Modified, Affirmed

Filed: March 18, 2026

Do Not Publish